**WEST SIDE WOMEN'S SERVICES, INC., et al., Plaintiffs,**

v.

**CITY OF CLEVELAND, OHIO, et al., Defendants.**

**No. C77–1112.**

United States District Court, N.D. Ohio, E.D.

Oct. 21, 1983.

Roy Lucas, Lucas & Assoc., Washington, D.C., Bernard Berkman, J. Michael Murray, Berkman, Gordon, Murray & Palda, Cleveland, Ohio, for plaintiffs.

John D. Maddox, Director of Law, Stuart A. Friedman, Asst. Director of Law, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

This action arises from an attempt by plaintiffs, West Side Women's Services, Inc. ("WSWS") and Dr. Richard Derman, to establish a clinic on the west side of Cleveland in an area zoned "local retail business district" for the purpose of offering family planning services. Those services were to include a first trimester abortion service. Plaintiffs challenge a Cleveland ordinance prohibiting the licensing of abortion services in areas zoned "local retail business districts." Defendants in this action include the City of Cleveland, the Mayor of Cleveland, the Cleveland City Council and Councilmen Robert Getz and Thomas Keane. Councilmen Getz and Keane introduced the ordinance in question.

Briefly, on March 1, 1978, this Court declined to enjoin the enforcement of the ordinance. On appeal to the Sixth Circuit, the Court's ruling was affirmed and the case was remanded for final resolution of the constitutional questions involved. The case is before us now on motions for partial summary judgment.

I.

WSWS is an organization set up to provide administrative and nonmedical services as part of a family planning practice. Dr. Richard Derman is a physician who specializes in obstetrics and gynecology.[1] Together, WSWS and Dr. Derman planned to establish a first trimester abortion clinic on the west side of Cleveland.

In May of 1977, WSWS signed a ten-year lease on office space located at 4170 West 130th Street in Cleveland. It made improvements on the property and purchased equipment and supplies in preparation for a September 1977 opening. It had obtained the necessary building permits for a "medical service and women's medical service."

The clinic site is in an area zoned as a "local retail business district." A "local retail business district" is defined as a "business district adjacent to or surrounded on at least three sides by Residence Districts in which such uses are permitted as are normally required for the daily local retail business needs of the residents of the locality only." Codified Ordinances of the City of Cleveland § 343.01(a) ("Cod.Ord."). Among the listed permitted uses for the local retail business district are "business offices," including "architectural, clerical, engineering, legal, dental, *medical* or other recognized professions ... in which only such personnel are employed as are customarily required for the practice of such business or profession and not exceeding a total of five persons at any one time." Cod.Ord. § 343.01(b)(3) (emphasis added). The Code does not define the term "medical office." In addition, the Cleveland zoning ordinance permits other uses in business districts that are "similar to the uses listed in this subsection (b) in type of goods or services sold, in business hours, in the number of persons or cars to be attracted to the premises and in effect upon the

---

1. Dr. Derman, the individual, is not named as a plaintiff in this action. Rather, it is his professional corporation, Richard J. Derman, M.D., Inc., that is named as a plaintiff. Plaintiffs state that the corporation was named because it is the real party in interest with regard to the alleged

financial injury suffered by Dr. Derman. As is explained more fully below, the Court finds no distinction of any significance between the two for the purposes of this opinion, and for simplicity's sake, will refer to this plaintiff as "Dr. Derman."

adjoining Residence Districts." Cod.Ord. § 343.01(b)(6).

At some time after the signing of the lease, the surrounding community became apprised of WSWS' intent to open an abortion clinic on West 130th Street. Many community residents voiced their opposition to the clinic. It was in response to fervent opposition that defendants Getz and Keane, two city councilmen, introduced an ordinance to ban abortion services from local retail business districts. The ordinance was introduced on July 18, 1977 and was passed on that same night by the City Council. Labelled an "emergency ordinance," it prohibits the issuing of an operating license to any abortion services located in a local retail business district. Cod. Ord. § 231.09.[2] Set out in the Health Code as an amendment to licensing requirements for abortion services, the ordinance had both the intent and effect of zoning out this abortion service and all abortion services from local retail districts.

Beyond merely reciting that the ordinance is intended for the "immediate preservation of the public health, safety and welfare," the record reveals that the intent of Councilman Getz in introducing the ordinance was to block the opening of WSWS and, apparently, any other abortion facility in close proximity to residential areas, in response to mounting public opposition. At the time the ordinance was passed, the City Council had made no findings that the WSWS clinic, or any other such facility, would give rise to any particular health or safety hazards.[3]

Subsequent to the passage of the ordinance, WSWS and Dr. Derman brought this action to "invalidate the ordinance as an unconstitutional effort to restrict first trimester abortion services." Injunctive, declaratory and monetary relief was sought under § 1983 for violations of privacy, equal protection and due process rights guaranteed by the Fourteenth Amendment. On March 1, 1978, this Court denied plaintiffs' motion for a preliminary injunction. *WSWS v. City of Cleveland*, 450 F.Supp. 796 (N.D.Ohio 1978). In ruling that plaintiffs had failed to demonstrate a probability of success on the merits, the Court found that the ordinance did not "unduly burden" a woman's decision to have an abortion, and further, that the ordinance merely represented a "value judgment" favoring childbirth over abortion. *Id.* at 798. The Court reasoned that the ordinance bore a rational relationship to a legitimate state interest, encouragement of live birth over abortion as an alternative method of dealing with pregnancy. Plaintiffs appealed to the Sixth Circuit. That court affirmed the denial of the preliminary injunction but refused to rule upon the constitutional questions presented and remanded to the district court. *WSWS v. City of Cleveland*, 582 F.2d 1281 (6th Cir.1978). The court noted that "on the limited facts before us we are unable to reach even a tentative conclusion as to the ultimate merits of the case and express no opinion thereon... [W]e should reserve judgment until after any final judgment has been entered upon a completed record." *WSWS v. City of*

**2.** The ordinance reads, in full:
WHEREAS, this ordinance constitutes an emergency measure for the usual daily operation of a municipal department and for the immediate preservation of the public health, safety and welfare; now, therefore,
BE IT ORDAINED BY THE COUNCIL OF THE CITY OF CLEVELAND:
Section 1. That the Codified Ordinances of the City of Cleveland, Ohio 1976 be and the same hereby are supplemented by enacting new Section 231.09 thereof, to read as follows:
*Section 231.09 Prohibition Against Issuing Abortion Service License in Local Retail District*

Notwithstanding any other provision of the Codified Ordinances of the City of Cleveland, no license, required under the provisions of Section 231.06, of the Codified Ordinances of the City of Cleveland, shall be issued for an abortion service to be located in a local retail business district ... and no abortion service shall operate in a local retail business district.

**3.** Many of these facts are found in the admissions of defendants obtained during discovery, as detailed more fully in Part III of this opinion. The court will refer to these admissions periodically and denote them as "Adm."

*Cleveland,* unpublished opinion, (6th Cir. August 15, 1978). The United States Supreme Court denied certiorari. 439 U.S. 983, 99 S.Ct. 572, 58 L.Ed.2d 654 (1978).

Discovery has been conducted in the interim, and the record is now complete. The Court now has before it the parties' cross-motions for summary judgment and partial summary judgment.[4] There are no questions of fact, only questions of law to be decided with regard to the constitutionality of this ordinance. Since this Court denied plaintiffs' motion for a preliminary injunction, the United States Supreme Court has had the occasion to address a variety of restrictions placed upon abortions and, in the process, has elaborated on the nature of the right it recognized in *Roe v. Wade.* Based on the most recent articulation of the law in this area, as laid out by the United States Supreme Court in *Akron Center for Reproductive Health, Inc. v. City of Akron,* 651 F.2d 1198 (6th Cir. 1981), *aff'd in part and rev'd in part,* — U.S. ——, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), this Court is compelled to hold that plaintiffs in the instant case are entitled to judgment.

## II.

### A.

Before reaching the constitutional questions presented in this case, the court will address defendants' arguments on standing and mootness. First, defendants argue that this action was mooted by the eviction of WSWS from the West 130th Street site for nonpayment of rent. They contend that the judgment of eviction, entered on December 12, 1978, moots the claims for injunctive and declaratory relief because WSWS no longer has an interest in the property.

■ For the following reasons, the fact that WSWS no longer occupies the premises on West 130th Street does not moot its claim for declaratory and monetary relief, even though it does moot the prayer for injunctive relief.[5] First, the ordinance actually would have prevented WSWS from obtaining the license necessary to operate an abortion service. Therefore, physical occupation of the premises would have been both futile and costly.[6] Moreover, keeping up with the rental payments would have greatly increased the plaintiffs' damages in this action. Not only would continuing with rent payments have been extremely wasteful, it also would have been contrary to the general requirement that plaintiffs attempt to mitigate their damages.

Second, and most important, the essence of the mootness question is whether there are no longer any "live" issues in the case or whether "the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1950, 23 L.Ed.2d 491 (1969). In the instant action, both plaintiffs allege monetary injury resulting from the unconstitutional acts of defendants. This damage claim is still viable and keeps the constitutional issues alive. The fact that an injunction may not issue does not prevent the Court from granting a declaratory judgment, so long as the claim for declaratory relief is sufficiently averred. The resolution of the constitutional question can then be used as a predicate to further relief, in this case, to monetary relief. *Id.* at 499, 89 S.Ct. at 1952. Since there is no contention that the pleadings are insufficient, the

---

4. Defendants Getz and Keane here moved separately for partial summary judgment. Their motion is the subject of Part V of this opinion.

5. Plaintiffs' counsel conceded during oral argument that plaintiffs' claim for injunctive relief is moot at this point. Transcript of Hearing at 9

("Tr."). He argued, however, that the remaining claims for relief are still alive.

6. While the ordinance did not prevent WSWS from opening and offering general counseling and gynecological services, plaintiffs have stated that it would not have been possible for WSWS

Court may entertain the claims for declaratory and monetary relief.[7]

■ Defendants' arguments that both plaintiffs lack standing to raise the constitutional issues presented have little merit. They first contend that "Richard J. Derman, M.D., Inc.," a named plaintiff and the professional corporation of Dr. Richard Derman, is not authorized to do business in Ohio and was not organized under the laws of Ohio. Second, they argue that Dr. Richard Derman is no longer licensed to practice in Ohio, although he was at the time this lawsuit was brought. Thus, defendants contend, neither the corporation nor the individual has any right to assert claims.

Simply put, the state of incorporation of "Richard J. Derman, M.D., Inc.", has no bearing on that plaintiff's standing to sue. The basis of federal jurisdiction here is a federal constitutional question. Equally irrelevant is the fact that neither Dr. Derman nor his professional corporation is currently registered or licensed in Ohio. Significantly, defendants do not contend that "Richard J. Derman, M.D., Inc." is not a legitimate professional corporation, nor do they deny that Dr. Derman is a physician who, at the time this lawsuit was filed, was licensed to practice in Ohio and actually sought to perform abortion services here. The heart of plaintiffs' case is that an alleged unconstitutional act of defendants caused these plaintiffs financial injury and interfered with the privacy rights of their would-be patients. That plaintiffs are not currently licensed to practice in Ohio does not change the fact that they claim injury based on defendants' conduct at a time when plaintiffs were licensed in Ohio.

The essence of the standing issue is whether a litigant has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The Supreme Court more recently gave a succinct description of the basic standing requirement:

> [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," ... [citation omitted], and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," ... [citation omitted].

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). This required element of "injury-in-fact" is present here where, in addition to declaratory relief, plaintiffs also seek monetary damages for financial injury suffered as a result of defendants' alleged unconstitutional actions. Moreover, the fact that the challenged ordinance had the immediate effect of blocking the opening of WSWS by precluding the possibility of it obtaining the necessary operating license, and the fact that criminal penalties attach to operating an abortion service without such a license, place this controversy in a sufficiently adversarial context that there is no danger of the Court merely rendering an

---

to survive financially unless it could have offered abortion services.

**7.** Defendants also assert that WSWS never attempted to apply for a license to operate an abortion facility, as required by Cod.Ord. § 231.06. Since plaintiffs never applied for an operating license, defendants argue that there is no "case or controversy" which this Court may resolve. However, a controversy does in fact exist. First, WSWS clearly would have been denied a license since the ordinance, by its terms, prohibits the establishment of *any* abor-

tion facility in local retail districts. Second, had WSWS attempted to offer abortion services without such a license, it would have been subject to criminal sanctions. Cod.Ord. § 231.99. There is no indication in the record that WSWS would not have been able to comply with the health regulations governing abortion facilities, the only apparent prerequisite to obtaining an operating license. Cod.Ord. §§ 231.07, 231.08. Thus, there is no evidence that WSWS would not have opened as planned in the absence of the challenged ordinance.

advisory opinion. Thus, plaintiffs have standing to raise at least their own claims.

■ Whether or not they also may be granted *jus tertii* standing to assert the privacy rights of their would-be patients depends upon several factors. First, the relationship between the litigant and the third party must be such that the enjoyment of the right is "inextricably bound up with the activity the litigant wishes to pursue." *Singleton v. Wulff,* 428 U.S. 106, 114, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976) (plurality opinion). The physician-patient relationship that arises when a woman seeks an abortion is sufficiently close to meet this requirement.

> The closeness of the relationship is patent, as it was in *Griswold* [*v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)] and *Doe* [*v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973)]. A woman cannot safely secure an abortion without the aid of a physician ... The woman's exercise of her right to an abortion, whatever its dimension, is therefore necessarily at stake here. Moreover, the constitutionally protected abortion decision is one in which the physician is intimately involved. See *Roe v. Wade,* 410 U.S., at 153–156 [93 S.Ct. at 726–728]. Aside from the woman herself, therefore, the physician is uniquely qualified to litigate the constitutionality of the State's interference with, or discrimination against, that decision.

*Singleton v. Wulff, supra,* 428 U.S. at 117, 96 S.Ct. at 2875. Similarly, the right of a woman to seek an abortion is "inextricably bound up" with the ability of the plaintiff-clinic to provide one. *Planned Parenthood of Minnesota v. Citizens for Community Action,* 558 F.2d 861, 865 n. 3 (8th Cir.1977); *Friendship Medical Center, Ltd. v. Chicago Board of Health,* 505 F.2d 1141, 1147–48 (7th Cir.1974); *cert. denied,* 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975). *See also Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328, 333–334 (5th Cir.1981), relying on *Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) and *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). In addition, any criminal penalties attaching to a violation of the ordinance in question would operate directly against Dr. Derman and WSWS. *See Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 62, 96 S.Ct. 2831, 2837, 49 L.Ed.2d 788 (1976); *Doe v. Bolton,* 410 U.S. 179, 188–189, 93 S.Ct. 739, 745–746, 35 L.Ed.2d 201 (1973). Thus, this is not a case where a litigant wishes to assert the rights of those with whom he or she is only marginally involved.

Second, *jus tertii* standing may be appropriate where restrictions placed upon the litigant's activities interferes with the rights of nonlitigant third parties. Relying upon its earlier decision in *Craig v. Boren, supra,* 429 U.S. at 195, 97 S.Ct. at 455, the Supreme Court ruled in *Carey v. Population Services International, supra,* 431 U.S. at 684, 97 S.Ct. at 2015, that the plaintiff in that case, a corporation engaged in mail-order retail sales of contraceptive devices, was in that category of "vendors and those in like positions [who] have been uniformly permitted to resist efforts at restricting their operations by acting as advocates for the rights of third parties who seek access to their market or function." In the instant case, plaintiffs have alleged that the act of restricting their operation in local retail districts has directly interfered with women's access to abortion services. This places WSWS in the position of those plaintiffs who are "entitled to assert those concomitant rights of third parties that would be 'diluted or adversely affected' should [its] constitutional challenge fail." *Id., quoting Craig v. Boren, supra,* 429 U.S. at 195, 97 S.Ct. at 455.

A third factor to be considered is the ability of the third party to assert her own right. The Supreme Court has noted that several obstacles exist to prevent a woman seeking an abortion from asserting her own rights. *Singleton v. Wulff, supra,* 428 U.S. at 117–118, 96 S.Ct. at 2875–2876. Of these, the most compelling is the desire to protect "the very privacy of her decision

from the publicity of a court suit." *Id.* at 117, 96 S.Ct. at 2875. *See also Carey v. Population Services International, supra,* 431 U.S. at 684 n. 4, 97 S.Ct. at 2015 n. 4.

It has been held in this Circuit that an abortion clinic has standing to assert its own claims as well as the constitutional rights of its potential patients. In *Mahoning Women's Center v. Hunter,* 610 F.2d 456 (6th Cir.1979), an abortion clinic challenged an ordinance that imposed extensive regulations upon clinics performing abortions. The court held that "[p]laintiff's financial interest assures its standing to attack the constitutionality of the ordinance," and additionally, that "plaintiff demonstrates sufficient stake in the outcome to assert the rights of its patients." *Id.* at 458 n. 2. Plaintiffs in the instant case have made such a showing. Recently, the Supreme Court affirmed in part the Sixth Circuit's decision in *Akron Center for Reproductive Health, Inc. v. City of Akron,* 651 F.2d 1198 (6th Cir.1981), *aff'd in part and rev'd in part,* —— U.S. ——, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983). In that case, an ordinance regulating abortions was challenged by three corporations operating abortion clinics and a physician who had performed abortions in one of the clinics. The standing issue never reached the Supreme Court. The Sixth Circuit did not question the standing of these plaintiffs to assert their own claims, as well as the constitutional claims of abortion patients. The court did affirm the district court's holding that the physician did not have *jus tertii* standing to challenge that portion of the ordinance which generally forbade abortions after viability, because that particular physician did not actually perform and did not seek to perform post-viability abortions. In other words, the physician had not suffered "injury-in-fact," and therefore did not have a sufficient stake in the outcome to represent the claims of others despite the close relationship with potential abortion patients. 651 F.2d at 1211. In the instant case, Dr. Derman in fact performs first trimester abortions and seeks to offer such a service in Cleveland at the West Side Women's Services clinic.

To summarize, the plaintiffs requests for declaratory and monetary relief are not moot, and plaintiffs have sufficiently demonstrated their standing to assert their own claims, as well as the constitutional claims of their would-be patients.

### III.

The Court now turns to the important constitutional questions presented by plaintiffs' challenge to the Cleveland ordinance. This ordinance represents an attempt by a municipality to restrict access to abortions. This is the first time this Court has been asked to review an ordinance which has the intent and effect of restricting the location of abortion services in the City of Cleveland.

The Court acknowledges the sensitive nature of the abortion issue. It is keenly aware of the current efforts among legislators, community organizations and religious groups to limit the availability of abortions, if not to altogether nullify *Roe v. Wade* and its progeny. Putting aside personal beliefs regarding the moral reprehensibility of abortion, no matter how deeply they are held, the evidence at hand, considered in light of applicable law, must take precedence.

The Court recalls Justice Holmes' observation that the life of the law has not been logic, but experience.[8] Legal principles cannot be mechanically applied like mathematical axioms to new problems, because the result we seek in law must be just and reasonable and not merely certain. Yet, while morality and experience may, to some extent, inform the courts on the more difficult issues of the day, it is nevertheless legal precedent, where it exists, that continues to be the primary guide for the lower courts. These prior decisions must be followed inasmuch as they are, purportedly, themselves the product of social

---

**8.** Holmes, *The Common Law* 1 (1881).

trends and experience. The *Roe* decision has been widely criticized, and that criticism has come not only from legal scholars, but also from within the ranks of the Supreme Court itself. Nevertheless, it remains the law of the land, and the starting point for the resolution of any controversy involving the purported abortion right. It is to that decision that the Court must turn.

### A.

The Supreme Court held in *Roe v. Wade,* 410 U.S. 113, 153, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973), that "the right of privacy ... is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." The right to choose abortion, however, though fundamental, is not absolute, and may be subject to some regulation based upon important state interests in "safeguarding health, in maintaining medical standards, and in protecting potential life." *Id.* at 154, 93 S.Ct. at 727. The state's interest in such regulation must be "compelling", and the legislative measure that regulates or infringes upon this right must be "narrowly drawn to express only the legitimate state interests at stake." *Id.* at 155, 93 S.Ct. at 728.

Under the *Roe* decision the relationship between a woman's privacy right and the State's interest in regulating the exercise of that right varies with the stages of pregnancy. Relying upon what it found to be the current state of medical knowledge, the Supreme Court chose "viability" as the point at which the State's interest in protecting potential human life becomes "compelling" so as to justify regulation protec-

tive of fetal life, including the outright proscription of abortions.[9] Prior to viability, but only after the end of the first trimester, the State's interest in the health of the mother becomes compelling and justifies regulation reasonably tailored to meet that end. *Id.* at 163, 93 S.Ct. at 731. This formula, therefore, assures that abortions performed during the first trimester will be virtually free of substantial regulation, inasmuch as these two important state interests are not yet sufficiently compelling to justify restrictions on the abortion procedure.[10]

> This means ... that, for the period of pregnancy prior to this "compelling" point, the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated. If that decision is reached, the judgment may be effectuated by an abortion free of interference by the State.

*Id.*

Despite strong criticism, this "three-stage" approach to the analysis of state regulations in abortion cases was strongly reaffirmed in the recent decision in *City of Akron v. Akron Center for Reproductive Health, Inc., supra,* —— U.S. ——, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983). Determining that substantial advancements in medical knowledge and technology have lengthened the period in which abortions may be safer than childbirth, thereby moving forward the point at which a State's interest in preserving maternal health becomes compelling, the Supreme Court stat-

---

**9.** The Court noted that viability, the point at which fetal life may be maintained outside the womb, usually occurs at about 28 weeks, but may occur as early as 24 weeks. *Roe v. Wade, supra,* 410 U.S. at 160, 93 S.Ct. at 730. The Court deliberately "left the point [of viability] flexible for anticipated advancements in medical skill." *Colautti v. Franklin,* 439 U.S. 379, 387, 99 S.Ct. 675, 681, 58 L.Ed.2d 596 (1979).

**10.** This does not mean that first trimester abortions are subject to no regulation at all. Certain regulations directed toward maintaining medical standards, such as reasonable recordkeeping, have been sustained, as have regulations

requiring the woman's informed written consent. *See Planned Parenthood of Missouri v. Danforth, supra,* 428 U.S. at 65–67, 79–81, 96 S.Ct. at 2839–2840, 2845–2847. Such procedures applicable to first trimester abortions are upheld because they are justified by important state health-related concerns, because they do not interfere with physician-patient consultation or with the woman's choice between abortion and childbirth, and because they have no significant impact on the exercise of a woman's right to an abortion. *City of Akron v. Akron Center for Reproductive Health, Inc., supra,* —— U.S. at ——, 103 S.Ct. at 2492–2493.

ed that the *Roe* standard nevertheless continues to provide a "reasonable legal framework for limiting a State's authority to regulate abortions." *Id.* at ——, 103 S.Ct. at 2492 n. 11. The Court also reaffirmed its requirement that a state restriction of the right to choose an abortion be justified by a compelling state interest, although, at the same time, it acknowledged that certain regulations applicable to first trimester abortions, having no significant impact on the decision to have an abortion, are permissible where justified by legitimate State concerns. *Id.* at ——, 103 S.Ct. at 2492–2493.

### B.

Although the Court in *Roe* held specifically that it is the *decision* to have an abortion that is constitutionally protected, later cases have demonstrated that not only the decision, but also the *effectuation* of the decision to abort a pregnancy, is protected. Based on these cases, not only may the State not interfere with the physician-patient relationship essential to the woman's decision-making process, but the steps it takes to restrict access to abortions or regulate the abortion procedure itself will also be closely scrutinized.[11]

The *Akron* decision is the Supreme Court's most recent statement affirming that both the decision to terminate a pregnancy and the effectuation of that decision are encompassed in the woman's right of privacy. In *Akron*, the Court noted that "the full vindication of the woman's fundamental right necessarily requires that her physician be given 'the room he needs to exercise his best medical judgment'. (Citations omitted). The physician's exercise of this medical judgment encompasses both assisting the woman in the decisionmaking

process *and implementing her decision should she choose abortion."* (Emphasis added). —— U.S. at ——, 103 S.Ct. at 2490–2492. The Court then went on to invalidate a variety of regulations, including one having a significant impact upon access to abortion services. Specifically, the Court held unconstitutional a requirement that second trimester abortions be performed in a hospital. It noted that this requirement placed "a significant obstacle in the path of women seeking an abortion" by requiring women "to travel to find available facilities, resulting in both financial expense and additional health risk," and to pay more for an abortion than what an independently operated clinic would charge. —— U.S. at ——, 103 S.Ct. at 2494–2496.

It is not the case, however, that every enactment touching in some manner upon access to abortions will evoke this high level of scrutiny. In *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), the Supreme Court upheld against a rational basis standard a state regulation denying medicaid benefits for nontherapeutic abortions. The Court emphasized that *Roe v. Wade* "did not declare an unqualified 'constitutional right to an abortion....' Rather, the right protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy. It implies no limitation on the authority of a state to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds." *Id.* at 473–474, 97 S.Ct. at 2382. Citing its earlier decision in *Bellotti v. Baird*, 428 U.S. 132, 149–150, 96 S.Ct. 2857, 2867–2868, 49 L.Ed.2d 844 (1976), the Court stated that " 'not all distinction between abortion and other procedures is forbidden' and that

---

**11.** For example, the Supreme Court in *Carey v. Population Services International, supra,* 431 U.S. at 688, 97 S.Ct. at 2018, stated that "[t]he significance of these cases is that they establish that the same test must be applied to state regulations that burden an individual's right to decide to prevent conception or terminate pregnancy by substantially limiting access to the means of effectuating that decision as is applied to state statutes that prohibit the decision entire-

ly." *See also Friendship Medical Center, Ltd. v. Chicago Board of Health, supra,* 505 F.2d at 1151, quoting *Roe v. Wade, supra,* 410 U.S. at 163, 93 S.Ct. at 732, "[the abortion decision] must be able to be 'effectuated by an abortion free of interference by the state' "). Obviously, the Court is saying that to afford no protection to the effectuation of the abortion decision would render meaningless the fundamental nature of the right.

'[t]he constitutionality of such distinction will depend upon its degree and the justification of it.'" A lower level of scrutiny than that employed in *Roe* is appropriate when what is at stake is merely "state encouragement of an alternative activity consonant with legislative policy", as opposed to "direct state interference with a protected activity." *Id.* 432 U.S. at 475, 97 S.Ct. at 2383. When a state's requirement for a lawful abortion creates no obstacles or "impose[s] no restriction on access to abortions that was not already there," the regulation does not impinge upon a woman's fundamental privacy right. *Id.* at 474, 97 S.Ct. at 2383.

The Court further refined this distinction in *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), in which it considered the constitutionality of the so-called Hyde Amendment, which prohibits the use of federal funds to reimburse the cost of even medically necessary abortions under the medicaid program. In upholding the prohibition, the Court reiterated that "although government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation." *Id.* at 316, 100 S.Ct. at 2688. The government is under no constitutional obligation, said the Court, to provide a woman with "the financial resources to avail herself of the full range of protected choices." *Id.*

Thus, the *Maher* and *Harris* decisions signalled the Court's acceptance of the idea that legislatures may distinguish between abortions and other types of medical services, so long as this does not actually place obstacles in the path of a woman's exercise of her freedom of choice. The government need not maximize the choices available to a woman, but, on the other hand, without a compelling justification, it may not create new obstacles to the exercise of the choice to have an abortion. If a regulation does not effect this kind of interference with the protected right, it need only bear a rational relationship to a legitimate state interest and will not be subjected to the more rigorous strict scrutiny test.

## C.

The Court in *Maher* stated that "a requirement for a lawful abortion 'is not unconstitutional unless it *unduly burdens* the right to such an abortion.'" 432 U.S. at 473, 97 S.Ct. at 2382, quoting *Bellotti v. Baird*, 428 U.S. 132, 147, 96 S.Ct. 2857, 2866, 49 L.Ed.2d 844 (1976) (emphasis added). Since that time, a dispute has arisen as to whether the "unduly burdensome" language was intended by the Court to be the threshold inquiry in an abortion case, the determination of which would result in the application of either the strict scrutiny analysis or the rational relationship test. In other words, does the "undue burden" question concern the level of scrutiny to be employed, or, rather, does it refer to the ultimate constitutional question to be addressed by the Court after the State's justifications have been proffered?

Unfortunately, the Supreme Court's decisions are less than clear on this point. In *Maher*, the Supreme Court measured the state's refusal to reimburse the cost of abortions against a rational relationship standard. It concluded that the regulation did not impinge upon a fundamental right because it merely reflected a legislative value judgment favoring childbirth over abortion and did not actually create obstacles to obtaining an abortion. Because, under basic equal protection analysis, a fundamental right had not been impinged, the rational relationship test was appropriate.

This Court had its first opportunity to construe the *Maher* language on plaintiffs' motion for a preliminary injunction in the instant case. At that time, the Court held that the ordinance does not "unduly burden" either the abortion decision or the physician-patient relationship. *WSWS v. City of Cleveland, supra,* 450 F.Supp. at 798. In support of its ruling, the Court pointed out that abortion services are available in other areas of the City, and that the ordinance does not attempt to regulate the method of providing first trimester abortions. The Court concluded that the func-

tion of the ordinance is merely to restrict the location of abortion facilities, which is a proper exercise of the City's police power under the zoning laws. The Court explained that "the City's decision to permit professional medical offices to operate in local retail business districts but to deny abortion clinics that right appears to be consonant" with its authority to make a value judgment favoring childbirth over abortion. Id.

The Sixth Circuit affirmed the denial of the preliminary injunction because, on the facts before it, that Court could not say that the district court had abused its discretion. However, the court declined to address the constitutional issues at that time, and did not have any comment on this Court's use of the *Maher* language. In the later *Akron* case, the Sixth Circuit specifically addressed the meaning of the Supreme Court's reference in *Maher* to "unduly burdensome" interference with the abortion decision. In that case, as here, the district court had ruled that only those regulations making it unduly burdensome for a woman to carry out her decision to have an abortion, and that are not rationally related to a legitimate state purpose, would be invalid. The Sixth Circuit said this of the relationship between the "undue burden" analysis and the level of scrutiny to be employed in such cases:

> We believe the district court read too much into the post-*Wade* decisions of the Supreme Court ...
>
> *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), offers even less support than *Danforth* for the proposition that the constitutionality of the Akron ordinance may be tested by some standard less demanding than a compelling state interest. The statute under attack in *Maher* forbade the expenditure of state funds for nontherapeutic abortions while permitting such expenditures for childbirth. The plaintiffs in *Maher* argued that the statute offended the Equal Protection Clause by creating an impermissible classification. In upholding the differences between the funding statute before it in *Maher* and the "dras-

tic" restrictions imposed on the abortion decision by the statute at issue in *Roe v. Wade* [410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147], 432 U.S. at 472, 97 S.Ct. at 2381–2382. Treating child birth and abortion as two alternative medical methods of dealing with pregnancy, the state was required to demonstrate only that there was a rational relationship between the decision not to fund nontherapeutic abortions and its decision to favor childbirth over abortions. The Court repeatedly emphasized in *Maher* that the Connecticut statute dealt only with funding and did not place any limitations on the right to have an abortion. *See also Beal v. Doe*, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977), and *Harris v. McRae, supra.*

As the Court pointed out in *Maher*, "[t]here is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." 432 U.S. at 475, 97 S.Ct. at 2383 (footnote omitted). In *Roe v. Wade*, as in the present case, the state attempted "to impose its will by force of law" by making it a crime to provide services which a pregnant woman is entitled to receive. *Id.* at 476, 97 S.Ct. at 2384. Such a statute impinges directly on a protected activity and requires strict scrutiny. The district court appears to have examined only the "degree" of state interference which each provision of the Akron statute imposed upon the abortion decision. It is clear that the *nature* of the interference must also be examined. *Maher* does not provide support for the claim that an ordinance such as the one now before us may be tested by a more lenient standard. We accept the statements of the Supreme Court that its later cases do not represent a retreat from the *Roe v. Wade* holding that the state's right to regulate abortions, at each stage of pregnancy, must rest on a compelling and legitimate state interest. *E.g., Maher v. Roe, supra,* 432 U.S. at 475, 97 S.Ct. at 2383.

*Akron Center for Reproductive Health, Inc. v. City of Akron, supra,* 651 F.2d at 1203–1204. The Court then concluded that a two-step analysis was required:

First, the nature of the particular regulatory provision must be considered. If it causes no "legally significant impact or consequence" on the right of a pregnant woman, in consultation with a physician, to choose to terminate her pregnancy, it does not raise a constitutional issue... Only if the provision does result in such significant impact or consequence must a second inquiry be made to determine whether or not the regulatory provision serves a legitimate and compelling state interest. If a compelling state interest is found, the regulation must be examined further to determine whether it imposes an "undue burden" on the abortion decision, that is, whether it is sufficiently narrowly drawn.

*Id.* at 1204.

The Supreme Court majority, on review of the Sixth Circuit's decision, neither explicitly rejected nor approved this analysis. Rather, in invalidating several provisions of the Akron ordinance, the majority employed the strict scrutiny standard, with its "compelling state interest" test, but only upon finding that the invalidated provisions had a "significant impact" on the woman's effectuation of her decision to have an abortion. In taking this approach, the majority implicitly rejected the analysis suggested in Justice O'Connor's dissenting opinion. Rather than requiring that any "restrictive state regulation" be justified by a compelling state interest, the dissent would only have applied the higher level of scrutiny to "unduly burdensome" regulations. "The 'undue burden' required in the abortion cases represents the required threshold inquiry that must be conducted before this Court can require a State to justify its legislative actions under the exacting 'compelling state interest' standard." *City of Akron v. Akron Center for Reproductive Health, Inc., supra,* — U.S. at —, 103 S.Ct. at 2506–2508 (O'Connor, J. dissenting).

It would appear, then, that a majority of the Supreme Court does not consider the "undue burden" standard to be the threshold inquiry that determines the level of scrutiny to be used in examining state regulation of abortions. Rather, it would require, as an initial matter, that a regulation have some significant impact, that is, not a de minimis burden, on the abortion decision or on access to abortions, before the Court requires a compelling justification for the regulation. If such an impact is shown, the higher level of scrutiny will be employed, and if the burden is not "undue" in light of the justifications proffered, the provision will survive the constitutional attack.

Among the lower courts, this court appears to be virtually alone in using the "undue burden" standard as a threshold inquiry in abortion cases. In addition to the Sixth Circuit's opinion in *Akron,* both the Fifth and Seventh Circuit have held that the "undue burden" language concerns the ultimate constitutional issue and not the level of scrutiny to be used in evaluating provisions regulating abortions. In a case closely analogous to the instant one, *Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328 (5th Cir. 1981), the court invalidated the city commission's denial of an occupational license to an abortion facility in an area zoned for business operations. In holding that the action interfered with a fundamental right, the court specifically criticized this Court's analysis in *WSWS v. City of Cleveland,* 450 F.Supp. 796 (N.D.Ohio 1978).

We believe that the court in *West Side,* and hence the lower court in the case at bar, misconstrued the Supreme Court's language in *Maher v. Roe.* The reference in *Maher* to "undue burden" concerns the ultimate question of the balance between the state proffered justifications for a measure and the burdens imposed by it as opposed to the level of scrutiny employed in making this evaluation. *See Charles v. Carey,* 627 F.2d 772 (7th Cir.1980). "[W]hen the government intrudes on one of the liberties protected by the Due Process Clause of the Four-

teenth Amendment, 'this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation.'" *Schad v. Borough of Mt. Ephraim,* 452 U.S. [61, 71, 101 S.Ct. 2176, 2184, 68 L.Ed.2d 671 (1981)], *quoting Moore v. City of East Cleveland,* 431 U.S. 494, 499 [97 S.Ct. 1932, 1935, 52 L.Ed.2d 531] (1977).

*Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d at 335–336.

*Charles v. Carey,* 627 F.2d 772 (7th Cir. 1980), referred to in the above passage, involved the constitutionality of several provisions regulating the abortion procedure. Defendants in that case, as here, argued that, in order to employ strict scrutiny, plaintiffs had to first show that the State's actions placed an undue burden on the women who opted for abortion. The court rejected the argument, stating that "undue burden" refers to the ultimate constitutional issue. "The threshold question whether there is a 'burden' or 'direct interference' in the pregnancy termination decision requires the plaintiff merely to show the requisite degree of interference. If the interference is sufficiently substantial and not de minimis, the State has to show the compelling basis for the law, that is, that the burden is not 'undue' or unjustifiable." *Id.* at 777.

■ Given such persuasive authority and particularly in light of the opinions of the Sixth Circuit and the Supreme Court in the *Akron* decision, which are binding here, this Court finds it necessary to revise its previous understanding of the language in *Maher.* It now holds that the higher level of scrutiny will be used to evaluate regulations having a substantial burden on the abortion decision. "Burden" as used here, refers not only to the degree but also the nature of the regulation. Such regulations must be justified by a compelling state interest, and will be deemed invalid if the proffered justifications are not substantial enough to justify the burden imposed. On the other hand, if the challenged regulation imposes only a de minimis burden on the abortion decision, the rational relationship test will be used.

### IV.

#### A.

■ Applying the aforementioned principles to the facts of the instant case, the Court finds that the ordinance in question imposes a sufficiently substantial burden on access to abortions to warrant the application of the strict scrutiny test. The basis for this finding lies primarily in the *nature* of the ordinance. First, this ordinance cannot be said to fall within the category of abortion regulations that place "no obstacle—absolute or otherwise—in the pregnant woman's path to an abortion." *Maher v. Roe, supra,* 432 U.S. at 474, 97 S.Ct. at 2382. Nor is this an example of mere "state encouragement of an alternative activity consonant with legislative policy." *Id.* at 475, 97 S.Ct. at 2383. Rather, in this instance, a municipality has created an obstacle to a woman's exercise of her protected right, an obstacle which did not previously exist and which, therefore, constitutes "direct state interference with a protected activity."

A look at the circumstances surrounding the passage of this ordinance puts into focus the nature of the City's interference with access to abortions. First, defendants have admitted that the ordinance was motivated by the planned opening of WSWS, and was passed to block that opening, as well as to prevent the establishment of any other abortion service in local retail business districts. (Adms. 52 & 63). There was no other apparent obstacle to the scheduled opening of the clinic. The Council created an obstacle that was not already present. Second, this ordinance constitutes a direct interference with the physician-patient relationship, which is protected under *Wade* and its progeny, including *Maher.* Under the ordinance, if a woman and her physician determine that an abortion is necessary, that physician, who, in all other respects, may be willing and able to perform the abortion, would be prevented

from effectuating that decision solely because of a legislative decision to ban abortions from local retail business districts, although that same physician could perform any other minor surgical procedure in his or her office. This restriction applies not only to physicians in clinics, but also to those physicians who maintain private offices in local retail districts. Cod.Ord. § 231.01 (defining "abortion service" as including an individual physician). In this way, the Cleveland ordinance interferes with the physician's exercise of his or her medical judgment, which "encompasses both assisting the woman in the decision-making process and implementing her decision should she choose abortion." *City of Akron v. Akron Center for Reproductive Health, Inc., supra,* ── U.S. at ──, 103 S.Ct. at 2491.

Defendants argue, however, that this case does not involve any fundamental right. Rather, the only issue at stake is whether plaintiffs have a right to operate their business wherever they choose. If that were the issue, this case would be a relatively simple one to resolve. Plaintiffs do not have the right to operate their business wherever they choose, and, indeed, they have never claimed such a right. Abortion clinics, like any other medical facility, are subject to the zoning and licensing laws. Defendants also argue that the impact of the ordinance in question upon the physician-patient relationship, and, consequently, upon the woman's decision to have an abortion, is minimal since the ordinance only applies to a very small portion of Cleveland and since abortion services are available elsewhere in the City.

Defendants' arguments are unavailing. First, they address only the *de-*

gree of the burden and fail to take into account the *nature* of the interference with the abortion decision. Second, and more importantly, an ordinance which interferes with a woman's exercise of her fundamental right is not safe from constitutional challenge merely because it is limited in its geographical scope. The Supreme Court in *Maher* noted that "a state-created obstacle [to obtaining an abortion] need not be absolute to be impermissible." *Maher v. Roe, supra,* 432 U.S. at 473, 97 S.Ct. at 2382.[12] Indeed, the same holds true for laws impinging on other fundamental rights. In the *Schad* case, the Court, quoting *Schneider v. State,* 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939), stated:

> [O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.

*Schad v. Borough of Mt. Ephraim, supra,* 452 U.S. at 76–77, 101 S.Ct. at 2186–2187. Similarly, it would be inconsistent with constitutional guarantees to overlook housing discrimination in one area of a city on the theory that minorities may freely live in other parts of that city. *See Buchanan v. Warley,* 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917) (invalidating ordinance preventing blacks from purchasing property on a block with a majority of white owners). The constitutionality of an ordinance restricting the availability of abortions must be determined on the basis of the burdens actually imposed by the restrictions and the justification for it. It is not sufficient merely to view the ordinance in light of all the other options available. The question is not whether the activity may be engaged in elsewhere, but whether it was constitutional to restrict it in the manner chosen by defendants [13].

---

**12.** The Court cited *Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), and *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).

**13.** It is significant that while there are thirteen licensed abortion facilities in the City of Cleveland, only four are free-standing clinics, none of which is located on the west side. By blocking the opening of WSWS, the City foreclosed a clinic alternative to women on the west side,

requiring those seeking that alternative to undergo additional expense and inconvenience to travel to the east side. *Cf. City of Akron v. Akron Center for Reproductive Health, Inc., supra,* ── U.S. at ──, 103 S.Ct. at 2494. As was previously explained, that WSWS may be able to relocate to a different district a few hundred feet away, assuming a site were available, is not dispositive of the issue of whether it was constitutional to ban it from its original site. In fact,

To summarize, it is the opinion of this Court that the challenged ordinance represents a legislatively-created obstacle to the effectuation of the abortion decision and directly interferes with a protected activity. Because, in this way, it impinges on a fundamental right, the rational relationship test is inappropriate, and the Court must measure the constitutionality of the ordinance against the strict scrutiny standard of review.

## B.

■ This conclusion is not changed by the fact that we are dealing here with a licensing restriction, or what is essentially a zoning decision on the part of the City of Cleveland.[14] The zoning power is, of course, quite broad, but it is not "infinite and unchallengeable," and "must be exercised within constitutional limits." *Schad supra*, 452 U.S. at 68, 101 S.Ct. at 2182, *quoting Moore v. City of East Cleveland*, 431 U.S. 494, 514, 97 S.Ct. 1932, 1943, 52 L.Ed.2d 531 (1977) (Stevens, J. concurring in judgment). Generally, zoning laws will be upheld if they are reasonable and "find their justification in some aspect of the police power, asserted for the public welfare." *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926). However, "as is true of other ordinances, when a zoning law infringes upon a protected activity, it must be narrowly drawn and must further a sufficiently substantial government interest." *Schad, supra*, 452 U.S. at 68, 101 S.Ct. at 2182.

In *Schad*, the Court invalidated the convictions of appellants who operated an adult bookstore featuring live dancing. The operators were prosecuted under a zoning ordinance which set forth several permitted uses in that commercial zone but did not specifically include live entertainment. The Court held the convictions invalid under the First and Fourteenth Amendments because the municipality had failed to justify its total exclusion of live entertainment, a protected activity, from the range of commercial uses permitted in the area. The Court distinguished the *Schad* case from *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). In *Young*, the Court upheld an ordinance regulating the location of adult movie theaters, but only after finding that it imposed a minimal burden on a protected activity. In particular, the Court emphasized that the justification offered for the ordinance—that the concentration of adult theaters could lead to the deterioration of the area—was supported by substantial evidence. *Id.* at 71, 96 S.Ct. at 2452–2453. In *Schad*, however, none of the proffered justifications withstood close scrutiny.

In *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), the Supreme Court employed a rational basis standard in upholding a zoning ordinance restricting the use of land to "one family" dwellings and defining "family" as including no more than two unrelated persons living together. The Court used the lesser standard of review because it found

---

it is not unreasonable to assume that the public opposition to WSWS and the publicity generated by the ordinance may discourage other clinics from attempting to open offices on the west side.

Moreover, if the argument of defendants were followed to its logical conclusion, nothing would prevent the City from passing future ordinances effectively banning abortion clinics from other zoned areas. Indeed, at least one other ordinance had already been passed, applicable to Residence-Office Districts. Cod.Ord. § 337.-10. So long as abortions were available at several other locations in the City, defendants' argument would go, such ordinances would be constitutional.

**14.** § 231.09 is actually a part of the Health Code and imposes a licensing restriction. However, the clear intent and effect of the ordinance is to ban all abortion services from local retail business districts. In terms of effect, there is virtually no difference between this ordinance and one that would simply exclude the provision of abortion services as a permitted use in such districts. The distinction, then, between this ordinance and a zoning law is largely a semantic one. The zoning cases cited in this opinion are, therefore, particularly helpful in resolving the issues presented here.

**520**

that the ordinance did not impinge on any personal fundamental rights. *Id.* at 7–8, 94 S.Ct. at 1540. Rather, the ordinance was passed in an effort to preserve aesthetic and family values, which the Court deemed to be permissible goals in the exercise of a municipality's police power. *Id.* at 9, 94 S.Ct. at 1541.

By contrast, the Court employed the higher standard of review in *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977). That case involved an ordinance that limited the occupancy of each dwelling to a single family, and defined "family" in such a way that prevented even certain related persons from living together. The Court invalidated the ordinance because it impermissibly impinged upon protected liberty interests. Its reasoning rested upon the view that freedom of personal choice in matters of family life deserves heightened protection under the Due Process Clause. In such cases, "the usual deference to the legislature is inappropriate.... [T]he zoning power is not a license for local communities to enact senseless and arbitrary restrictions which cut deeply into private areas of protected family life." *Id.* at 499, 507, 97 S.Ct. at 1935, 1939.

■ Finally, several lower courts have held that zoning and similar laws that impinge upon a woman's decision to have an abortion are subject to heightened scrutiny. Of these, the case most analogous to the instant action is *Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328 (5th Cir.1981). The City in that case had denied an occupational license to an abortion clinic to operate in the area adjacent to residences but zoned "Highway Business District." In reversing the denial of a preliminary injunction the court concluded:

A zoning decision that prevents the establishment of an abortion clinic in a particular locality constitutes affirmative

governmental interference with the abortion decision rather than merely a determination not to remove restrictions on access to abortions that already exist. *Id.* at 335. The court specifically criticized this Court's earlier use of the rational basis standard,[15] and applied strict scrutiny to the justifications proffered by the City for the burden imposed on the abortion decision. *Id.* at 334–338. And in *Planned Parenthood v. Citizens for Community Action,* 558 F.2d 861 (8th Cir.1977), the Court rejected the City's reliance on its zoning power to justify a six-month moratorium against construction of abortion facilities.

There is no judicial authority allowing a municipality, by imposing special restrictive zoning requirements on first trimester abortion clinics, to do indirectly what it cannot do directly by medical regulation.

*Id.* at 868.[16] In short, a municipal ordinance which imposes a burden on the exercise of a fundamental right is not shielded from the close scrutiny of the court merely because its apparent source is the police power. Rather, that ordinance will be examined to determine whether it is narrowly drawn to further legitimate objectives of the police power.

### C.

■ The Cleveland ordinance discriminates against abortions by banning abortion services, and no other minor surgical procedure from local retail business districts. Of course, a regulation is not unconstitutional merely because it distinguishes between abortions and other procedures. *Maher v. Roe, supra,* 432 U.S. at 473, 97 S.Ct. at 2382, citing *Bellotti v. Baird, supra,* 428 U.S. at 147, 96 S.Ct. at 2866. Rather, "[t]he constitutionality of such distinction will depend upon its degree and the justification for it." *Bellotti, su-*

15. *See* discussion *supra,* at 507.

16. *See also Framingham Clinic, Inc. v. Board of Selectmen,* 373 Mass. 279, 367 N.E.2d 606 (1977) (abortion clinics declared a prohibited use for all districts); *Fox Hill Surgery Clinic v. City of*

*Overland Park,* No. 77–4129 (D.Kan. July 11, 1977) (enjoining City's rezoning of lot in order to block construction of health facility which was to offer early abortions).

*pra,* 428 U.S. at 149–150, 96 S.Ct. at 2867. The degree of the distinction in the instant case is clear: the ordinance effectively bans abortions from local retail business districts by prohibiting the issuance of an operating license to any abortion service, whether it be a clinic or an individual physician. But defendants have made no real attempt to justify this total ban. Indeed, they cannot do so, for every possible explanation fails under close scrutiny.

One possible justification for the ordinance may be found in its Preamble, which states that "this ordinance constitutes an emergency measure providing for the usual daily operation of a municipal department and for the immediate preservation of the public health, safety and welfare." There is no indication anywhere in the record of any actual emergency the ordinance was enacted to address. Nor is there any evidence to support the contention that the provision of first trimester abortion services by WSWS, or any other clinic or physician, poses a threat to the health, safety or welfare of residents or visitors to that locality. Defendants admit that the Council was presented with no evidence, and made no findings, that offering abortion services at the clinic would threaten the physical health or safety of people in the area (Adm. 38), or would result in excessive noise, parking problems or fire and traffic hazards. (Adm. 39). It was admitted that the building where WSWS intended to locate is consistent in size and appearance with other buildings in the neighborhood, (Adm. 99), and that the number of persons or cars attracted to the premises of a medical office providing abortion services is similar to that number attracted to other medical or professional offices (Adm. 12). Moreover, it is not "immediately apparent as a matter of experience," *Schad v. Borough of Mt. Ephraim, supra,* 452 U.S. at 73, 101 S.Ct. at 2185, that abortion facilities are prone to health or safety problems more significant than those associated with other medical facilities. Even assuming that the existence of an apparent free-standing abortion clinic in a local retail district could give rise to public disturbances (and no such evidence concerning WSWS is apparent in the record), the ordinance is not narrowly drawn to meet this potential problem, for it applies not only to clinics, but to individual physicians whose activities in the privacy of their offices are not apparent from the street. Whatever unique problems might arise from the provision of abortion services in local retail business districts, the City has not shown that these problems could not be met by some means less intrusive than a total ban of this protected activity. *Cf. Schad v. Borough of Mt. Ephraim, supra,* 452 U.S. at 73–74, 101 S.Ct. at 2185–2186.

A second possible justification is that the provision of abortion services would threaten neighboring residential areas. (Adm. 63). This justification fails, first, because no evidence was presented indicating either the manner in which the existence of abortion services would pose such a threat or the utility of this ordinance in protecting the residential areas. Second, any purported intent to preserve residential areas is difficult to reconcile with the zoning scheme for the district in question and other Cleveland districts. A wide variety of uses is permitted in local retail business districts, including a broad range of retail businesses, service stations, restaurants, fast food establishments and even bars or taverns.[17] The City fails to demonstrate how the existence of an abortion clinic, or the provision of first trimester abortion services in the offices of a private physician, would be any more disturbing to the neighboring residential areas than any of these permitted uses. Moreover, physicians may open offices in their own homes in any of the six residential-zoned districts of the City of Cleveland,[18] and there is apparently no ordinance preventing them

---

**17.** This last use is permitted so long as it is not located within 500 feet of a church, library, school, playground or other recreational area. *Cod.Ord.* § 343.01(b)(F).

**18.** *See Cod.Ord.* § 337.23(a)(1).

from performing first trimester abortions there. The variety of uses permitted in residential areas belies the purported objective of protecting such areas.

A third possible justification is that the provision of abortion services in local retail business districts would conflict with the City's plan for a business area designed to cater to the needs of local residents. Again, there is no evidence in the record indicating that first trimester abortion services are not among the many services required or sought by women residents of the area. Moreover, it is not readily apparent why abortion services are any less consistent with the needs of local residents than are, for example, engineering or architectural offices, which are listed among the permitted uses for local retail districts.

Finally, one may attempt to justify an ordinance such as this one as expressing a value judgment favoring childbirth over abortion. Indeed, in denying a preliminary injunction in this case this Court stated that the ordinance "appears to be consonant with such a 'value judgment'". *WSWS v. City of Cleveland, supra,* 450 F.Supp. at 798, citing *Maher v. Roe, supra,* 432 U.S. at 473, 97 S.Ct. at 2382. Upon closer examination, however, even this purported justification must fail. First, the City Council received no evidence and made no findings prior to the passage of the ordinance that the measure would promote or encourage childbirth over abortions, (Adm. 60), and no member of the City Council, nor any city official, made any public statement to the effect that the ordinance is intended to encourage childbirth over abortions. (Adm. 61). Second, it is difficult to determine why the City, when electing to express this value judgment, selected local retail business districts, rather than residential areas, as the areas from which to ban abortion services. Third, it is difficult to determine how a licensing requirement or zoning ordinance could promote or achieve that objective. The effect

of the ordinance is to force women seeking abortions to look elsewhere. It is unlikely, and there is no evidence in the record to support the view, that the ordinance would encourage women to carry the fetus to term.[19] Even assuming, however, that it could have this effect, the justification is insufficient to save the ordinance.

It is true, of course, that the preservation of such things as family values has been held to be a legitimate and admirable objective of the police power. *See, Village of Belle Terre v. Boraas, supra,* 416 U.S. at 9, 94 S.Ct. at 1541. An ordinance expressing a legislative value judgment favoring childbirth over abortion would be a proper exercise of the police power even without further justification. However, the Supreme Court in *Belle Terre* held that the ordinance under its analysis did not infringe on any fundamental constitutional rights, including the right to privacy. *Id.* at 7, 94 S.Ct. at 1540. That is not the case here. By banning all abortion services in an area where medical offices are otherwise permitted, the Cleveland ordinance interferes directly with the physician-patient relationship and thereby unduly burdens the woman's right to seek an abortion.

*Maher v. Roe* and *Harris v. McRae,* relied on by defendants, must once again be distinguished from the instant case. The decision to refuse to subsidize abortions with public funds was upheld because it did not constitute a state-created obstacle to the effectuation of the abortion decision. Thus, legislative action designed to encourage childbirth is constitutionally valid so long as it does not directly interfere with the protected activity of seeking an abortion and does not create a new obstacle to the exercise of this fundamental right. The expression of a value judgment may be a legitimate justification for those regulations affecting access to abortions that merely articulate the legislature's refusal to remove obstacles not of the State's cre-

---

19. This ordinance should be compared to the State's decision to refuse reimbursement of the costs of abortion while subsidizing the costs associated with childbirth, as was the case in *Maher.* Such a regulation is more clearly designed to encourage childbirth than is the ordinance at issue.

ation. It is not a constitutionally sufficient justification when the effect of a regulation is to impose the will of a legislative majority by creating an absolute obstacle to the exercise of a fundamental right. If a licensing or zoning ordinance could be justified *merely* on the basis of a legislative body's authority to make a value judgment favoring childbirth, then any city or state could freely ban abortions through zoning or licensing laws regardless of the extent to which such action would affect access to abortions.[20]

### D.

Defendants have therefore failed to justify this ordinance by demonstrating a compelling state interest. Moreover, they have failed to meet the less stringent requirement of showing that the distinction drawn by the ordinance between abortion services and other medical procedures is " 'rationally related' to a 'constitutionally permissive' purpose." *Maher v. Roe, supra,* 432 U.S. at 478, 97 S.Ct. at 2385.[21] The only explanation for this distinction supported by the record before this Court is that the ordinance was prompted by public hostility toward abortion clinics. The un-equivocal admissions of defendants, which must be accepted by this Court as conclusively establishing the matter admitted,[22] allow for no other conclusion.

██ Defendants admit that the passage of the ordinance was precipitated by the anticipated opening of WSWS, and that the ordinance was passed with the intent of blocking the opening of the facility. (Adm. 52 & 63). Defendants Getz and Keane, the members of the City Council who introduced the ordinance stated that they decided to sponsor the legislation after having received phone calls from their constituents objecting to the opening of the clinic. Moreover, they were aware that petitions were circulating objecting to the planned facility. Affidavits of Getz and Keane. These statement and admissions strongly suggest that the challenged ordinance had little to do with any health or safety problem, or any other legitimate objective. The evidence before the Court reasonably leads to the conclusion that the ordinance was born of negative sentiment on the part of some members of the community toward abortions and abortion clinics. That such beliefs may arise from deeply held moral convictions does not excuse the fact that the ordinance impermissibly interferes with a woman's right to seek an abortion. A municipality has no legitimate interest in shielding certain members of a community from constitutionally-protected activities which they find offensive on personal, moral, or even religious grounds.

> [I]t is inherent in the right to make the abortion decision that the right may be exercised ... in defiance of the contrary opinion of the sovereign and other third parties.

**20.** Admittedly, this is not the situation before the Court today. Cleveland has not attempted to pass numerous ordinances restricting or prohibiting the licensing of abortion facilities. In fact, defense counsel specifically pointed out that the City has not sought to restrict the total number of abortion clinics within city limits. But the Court cannot be blind to the implications of a ruling approving this ordinance despite the lack of any legitimate reason for its existence. That many people strongly disapprove of abortions, regardless of how sincerely such beliefs are held, simply cannot be a legitimate justification for denying others access to abortions given the relevant law as it now stands.

**21.** The total ban of abortions from local retail business districts arguably may be "rationally

related" to the City's interest in encouraging childbirth. But the ordinance fails to meet even the more lenient standard. First, as already noted, it is unlikely that this ordinance encourages women in the area to carry a fetus to term. In *Maher v. Roe,* by contrast, the Supreme Court found that the subsidization of costs associated with childbirth, but not those associated with abortions, clearly encourages indigent women to accept the former, more attractive alternative. 432 U.S. at 479, 97 S.Ct. at 2385. Second, even assuming that a ban on issuing licenses to abortion facilities may in some way promote childbirth, there is no evidence indicating that a ban applicable only to *local retail business districts,* as opposed to residential or industrial districts, furthers that objective.

**22.** Fed.R.Civ.P. 36(b).

*Charles v. Carey, supra,* 627 F.2d at 778. *See Deerfield Medical Center v. City of Deerfield Beach, supra,* 661 F.2d at 337; *cf. Erznoznik v. City of Jacksonville,* 422 U.S. 205, 210, 95 S.Ct. 2268, 2273, 45 L.Ed.2d 125 (1975) (invalidating an ordinance making it a public nuisance and punishable offense for drive-in theater to exhibit films containing nudity, and rejecting the proffered justification that the ordinance sought to protect those who find such films morally offensive).

This does not mean that there are no circumstances in which a zoning or licensing ordinance such as this one would be upheld, despite the fact that it may discriminate between abortions and other medical procedures.[23] The Court's ruling today only means that the constitutionality of such ordinances will depend on the City's ability to demonstrate a legitimate justification for the regulation. The City of Cleveland has not met its burden, and so the ordinance in question must fail.

## V.

To summarize, the Court finds:

1. That plaintiffs' claims for declaratory and monetary relief are not moot;

2. That plaintiffs have standing to assert their own claims and also *jus tertii* standing to assert the claims of their potential patients;

3. That the ordinance is subject to strict scrutiny because it is a state-created obstacle to access to abortions and constitutes direct interference with the abortion decision and the physician-patient relationship; and

4. That defendants have failed to offer any legitimate justification for the ordinance, and moreover, that the ordinance is a product of public opposition to abortion and abortion clinics.

§ 231.09 of the Codified Ordinances of Cleveland impermissibly interferes with a woman's right to seek an abortion, and,

therefore, unconstitutionally infringes upon fundamental rights guaranteed by the Constitution. Because the ordinance is unconstitutional, plaintiffs were wrongly precluded from establishing an abortion service at the planned site, and are, therefore, entitled to partial summary judgment.

## VI.

The law in this Circuit is that municipal legislators do not enjoy absolute immunity from liability under the Civil Rights Act, but rather, only a qualified immunity. *Nelson v. Knox,* 256 F.2d 312, 314-15 (6th Cir.1958). The issue of liability is determined with the application of a "good faith" test. *Id.* at 315. *See also Gaffney v. Silk,* 488 F.2d 1248, 1250-51 (1st Cir.1973). From a reading of the pleadings it is clear that, in the instant case, the question of whether defendants Getz and Keane acted in bad faith in introducing the ordinance is one of material fact. Although it appears that it would be difficult to prove bad faith on the part of the defendants, it would be inappropriate to resolve the issue on a motion for summary judgment.

Plaintiffs' motion for partial summary judgment is granted. The motions of defendants are denied. The Court will shortly set up a briefing schedule on the issue of damages and attorneys' fees.

IT IS SO ORDERED.

---

23. Of course, the Court's decision also does not mean that a city may not restrict the location of abortion facilities in the same manner that it restricts the location of other facilities. What it may not do, is discriminate against abortion facilities on the ground that some members of the public oppose them.