**P.L.S. PARTNERS, WOMEN'S MEDICAL CENTER OF RHODE ISLAND, INC., Malcolm L. Polis, Randy A. Lazarus and Howard Sanders, Plaintiffs,**

**v.**

**CITY OF CRANSTON; Michael A. Traficante, in his capacity as Mayor of the City of Cranston; Richard P. Crudele, in his capacity as Director of the Department of Inspections for the City of Cranston; F. Charles Haigh, in his capacity as Deputy Director of Inspections for the City of Cranston and Secretary to the Cranston Zoning Board of Review; and Al Bellows and George Gilbert in their capacities as Building Inspectors for the City of Cranston, Defendants.**

Civ. A. No. 87–0522 P.

United States District Court,
D. Rhode Island.

June 28, 1988.

Judith Colenback–Savage, Deming E. Sherman, Providence, R.I., for plaintiffs.

Arthur A. Thovmasian, Jr., Cranston, R.I., Joseph Kelly, Providence, R.I., for defendants.

Earl Pasbach, Providence, R.I., for intervenor.

## OPINION

PETTINE, Senior District Judge.

This is a Civil Rights action against the City of Cranston, its Mayor, and the Cranston Building Inspector and several of his subordinates for acting individually and in concert to deprive plaintiffs of Due Process and Equal Protection of the laws in violation of 42 U.S.C. section 1983 and 42 U.S.C. section 1985.[1] The plaintiffs allege that these individuals acted to frustrate their construction of an out-patient abortion facility in the city of Cranston.

## INTRODUCTION

The essential facts, with further elaboration to be found in the opinion where appropriate, are as follows:

The Women's Medical Center of Rhode Island, Inc. ("Women's Center") is a Rhode Island corporation that has, for the past ten years, provided various pregnancy-related services in its Providence offices. It is licensed by the state as a "Freestanding Ambulatory Surgical Center"[2] and is authorized to perform abortions. P.L.S. Partners ("PLS") is a Pennsylvania general partnership established to do business in Rhode Island. PLS's partners include Malcolm Polis, Randy Lazarus, and Howard Sanders, who are also officers and directors of the Women's Center. After eight years of operating at offices located in Providence, the Women's Center began to search for a new location, eventually casting an acquisitive eye toward property located at 1725 Broad Street, Cranston, Rhode Island.

Under the Cranston Zoning Ordinance, the Broad Street property lies within a C–1 commercial zone, which is reserved for the development of "Office Business." Certain establishments are automatically permitted within the zone, certain others are excluded, and a small number are permitted at the discretion of the Zoning Board and upon issuance of a special use permit. Special use permits, according to the Code, shall be issued if the Board determines, after conducting a public hearing, that the intended use of the establishment satisfied the following criteria:

It shall be compatible with its surroundings;

It shall not be injurious, obnoxious, or offensive to the neighborhood;

It shall not hinder the future development of the city; and

It shall promote the general welfare of the city.

"Health Care Facilities" are automatically permitted in a C–1 zone. "Hospitals," however, are permitted only upon issuance of a special use permit. A Health Care Facility is defined as:

A facility or institution, whether public or private, principally engaged in providing services for health maintenance, diagnosis or treatment of human disease, pain, injury, deformity, or physical condition, including but not limited to public health center, diagnostic center, treatment center, rehabilitation center, extended care facility, intermediate care facility, chronic disease hospital, out-patient clinic, dispensary, home health care agency, boarding home or residences for sheltered care, and medical or dental laboratories or central services facility serving one or more such institutions but excluding institutions that provide healing solely by prayer.

A Hospital is defined as:

An institution providing primary health services and medical or surgical care to persons, primarily inpatients, suffering from illness, disease, injury, deformity, and other abnormal physical or mental conditions, and including as an integral

---

1. Although plaintiffs had originally named as defendants members of the Cranston City Council, plaintiffs dropped their claims against these parties at the close of the trial.

2. Rhode Island Department of Health Regulations define a Freestanding Ambulatory Surgical Center as:

an establishment ... equipped and operated exclusively for ambulatory patients for the purpose of performing surgical procedures which ... in the opinion of the surgeon and anesthesiologist can be performed safely without requiring extensive anesthesia or overnight stay.
R23–17–FASC

part of the institution, related facilities such as laboratories, out-patient facilities or training facilities.

After determining that the proposed Women's Center would fall under the category of "Health Care Facility," Randy Lazarus, a PLS partner, purchased the property for the partnership. On August 28, 1987, after contracting with a general contractor to erect the Women's Center, PLS applied to the Cranston Department of Inspections for a building permit; accompanying the application were, as required by the ordinance, the architectural plans and specifications of the proposed facility. Although the permit application described the Women's Center as a Health Care Facility, neither it nor the plans and specifications indicated explicitly that abortions would be performed at the Women's Center.

The Cranston building inspector, Richard Crudele, is charged with enforcing the city's zoning code. After reviewing the application and the architectural plans, he issued a building permit to PLS. He did not inquire as to the nature of the particular treatment to be offered at the Women's Center, but was apparently satisfied by the application's description of the Women's Center as a Health Care Facility. Because, apparently, the plans and specifications seemed to conform to that description, no conflict arose. Immediately following issuance of the permit, PLS commenced construction and resolved, after conferring with the contractor, to occupy the building by January 31, 1987.

Sometime shortly before September 28, Inspector Crudele's office received calls from Cranston residents complaining about the location of an abortion clinic in Cranston. At approximately the same time, the office of Cranston Mayor Michael Traficante received similar complaints. Crudele began to suspect that performance of abortions in a C–1 zone, without a Special Use permit, would constitute an "illegal use" under the Cranston Code. He began discussions with Mayor Traficante and the City Solicitor, Bill Henry, as to whether to issue a Cease and Desist Order to PLS. According to Crudele, Mayor Traficante,

although he did not instruct Crudele to issue a Cease and Desist Order, encouraged him "to do [his] job properly." Bill Henry apparently advised Crudele that his suspicions that the Women's Center would be conducting an illegal use were correct. Finally, relying ultimately on Bill Henry's assessment that "It has been our practice to require clinics [that perform minor surgery] to go before the zoning board for a special permit," Crudele, through his deputy building inspector, issued a Cease and Desist Order to PLS on September 28, 1987. He issued the order apparently after his assistant, F. Charles Haigh, confirmed that abortions were going to be performed by talking with Norton Salk, the architect for PLS.

In a September 28 letter to PLS explaining his action, Crudele stated that "It has been brought to our attention, through complaints received, that there currently exists an alleged violation of the City of Cranston Zoning Code, Section 30–15 (permitted uses)." Crudele directed PLS to contact his office within forty-eight hours from receipt of the letter to arrange for a hearing. Crudele simultaneously issued a Stop–Work Order on the Premises.

Several days later, on October 2, at the request of PLS's counsel, Crudele conducted what he considered to be an "informal hearing" to review the Cease and Desist Order. Present at the hearing, in addition to Crudele, were the City Solicitor, the Deputy Inspector, PLS's counsel and, at Crudele's invitation, counsel for Anna Sullivan, a Cranston resident and Chairperson of the State Chapter of Right to Life. Crudele heard arguments from PLS's counsel and from Sullivan's counsel; at the conclusion of the hearing he affirmed his previous decision. Crudele subsequently embodied his ruling in a written decision issued on October 5, 1987. In that decision, Crudele provided the following explanation:

That the proposed use of the premises offered by petitioner, P.L.S. Partnership, is more in the nature of a hospital than in the nature of a health care facility, as said terms are defined in the Cranston Zoning Code;

That the Building Inspector, in determining the issue of whether or not the proposed facility is a hospital versus a health care facility, is not convinced by the argument raised by counsel for the petitioner that patients will not remain over night at the facility.

Crudele further indicated that PLS had until October 12, 1987, to file an appeal with Cranston's Zoning Board of Review.[3] Immediately following Crudele's written order, plaintiffs filed a Civil Rights action in this court under 42 U.S.C. section 1983 seeking damages and requesting this court to enjoin the City from preventing construction of the Women's Center. Plaintiffs also filed an appeal with the Zoning Board of Review which, by stipulation of the parties, was stayed pending the outcome of the court's decision.

On October 22, 1987, this court, after a hearing and with consent of both parties, issued a restraining order enjoining the City from interfering with construction.[4] Construction proceeded and the building was completed in March, 1988, at which time the contractor, on plaintiff's behalf, applied for the necessary Occupancy Permit. In response to that application, members of the Department of Inspections conducted two inspections, requesting certain alterations necessary to bring the building up to Code. The contractor promptly complied. Crudele then visited the premises for a third inspection and pronounced that the building was "structurally" built to Code. He added, however, that he was going to recommend that the City Solicitor deny the Certificate of Occupancy.

On March 30, 1988, Crudele denied the Certificate of Occupancy. He reiterated his earlier position that "the use to which the premises will be put is more in the

nature of a hospital than a health care facility" and that a special permit was required "for a hospital use." Plaintiffs promptly returned to this court requesting an injunction. This court held a conference on April 8, 1988 and, upon agreement of counsel, entered an order permitting plaintiffs to occupy the building and to perform the full range of pregnancy-related services with the exception of abortions. Plaintiff's motion for injunction was consolidated with the trial on the merits pursuant to Fed.R.Civ.P. 65(a)(2) and trial commenced one week later on April 19, 1988.

## DISCUSSION

Plaintiffs allege a host of constitutional and common law violations. They argue that Crudele's conduct violated substantive and procedural due process, as well as the guarantees of the equal protection and takings clauses. They also contend that Crudele intentionally interfered with contractual and business relations, violated numerous state statutes, and is estopped from revoking the building permit on the theory of equitable estoppel. Their primary allegation is that Crudele revoked the building permit and subsequently denied the Certificate of Occupancy because of the public hostility that was generated over the Women's Center and because of the personal feelings of various members of Cranston's mayoral office. They contend that although the Women's Center met all of the requirements for a Health Care Facility, an automatically permitted use in a C–1 zone, Crudele, by distorting the definition of permitted uses under the Cranston Code, artificially characterized the Women's Center as a hospital, thereby imposing the additional requirement that PLS apply for and obtain a special use permit. They argue that Crudele's characterization is wholly

---

3. Section 30–49(k)(1) provides:
 The zoning board of review shall have the power to hear and decide appeals where it is alleged there is any error in any order, requirement, decision, or determination made by the inspector of buildings....

4. While believing that any issue concerning possible substantive due process violations was premature, this court, relying on Rhode Island Supreme Court authority, believed that plaintiffs

had acquired property rights in the building permit, had invested considerable expense in reasonable reliance thereon, and that the revocation without prior notice or hearing presented a probability of success on their procedural due process claim. This court believed at the time that issues concerning possible substantive due process violations could be litigated if the inspector, after completion of the building, denied an Occupancy Permit.

unsupportable, was motivated by abortion-animus, and has the effect of burdening the exercise of a fundamental right.[5]

At bottom, the dispute centers around Crudele's interpretation of a dozen or so words found in the Cranston Code's definition of a Hospital. That section reads: "An institution providing primary health services and medical or surgical care to persons, primarily inpatients...." Crans. Code section 30-3. Crudele testified at trial that in classifying the Women's Center as a hospital he considered the operative language of the passage to be "An institution ...] providing ... surgical care." He reasoned, or, more precisely, concluded, that abortions were, to his thinking, "major surgery" and therefore any facility that performed such procedures must be *a priori* a hospital. As he saw it, "surgical care is when a medical person enters someone's body, somewhere, with medical instruments and performs some sort of procedure." Mr. Crudele contrasted this definition with "stitching a cut or repairing a broken leg," which he considered "mainly patch-up work," and which apparently is performed in an emergency health center in the C–1 zone, and further distinguished "a dentist or something, [who] make[s] a little cut to pull a tooth" under general anesthesia, which is also permitted automatically within the zone. The performance of these latter procedures, according to Crudele, were either not surgery "per se" or were minor surgical procedures. When asked how he determined that abortion was "major surgery," Crudele offered this explanation:

> I am not a doctor but through many years of news clips and T.V. clips of what an abortion is.... I am an adult human being. I think I have a general idea of what abortion is and on that basis I felt that this certainly was a surgical procedure.
>
> ....
>
> This is more of a major surgery. This is actual entering of a human body with this type of surgery so this is more ma-

jor, as far as I'm concerned, by the—what I read in the definitions in the zoning book of Cranston than just patch-up work of an emergency center.

Plaintiffs consider this interpretation of the Code to be tortured and developed exclusively as a means to frustrate the opening of an abortion facility in the city of Cranston. They argue that the words "primarily inpatient" constitute the single-most important criterion under the Code for determining whether the Women's Center constitutes a Hospital. They reason that because even Crudele defined "inpatients" as patients who "stay overnight," the Women's Center, because it does not intend to keep patients overnight, nor, in fact, is it equipped to do so, cannot be characterized as a Hospital.

Plaintiffs' arguments are not without considerable appeal. Not only does the Cranston Code closely resemble the State's Rules and Regulations for Licensing of Hospitals, which defines hospital as a "facility ... providing ... services *primarily for inpatient care*," but as a practical matter it seems unlikely that the building inspector, who is solely responsible for enforcing the code, was entrusted to make hair-splitting medical decisions concerning the degree of intrusiveness involved in any given procedure. Suffice it to say that this was quite vividly illustrated during Crudele's testimony. It seems more rational to expect the building inspector to render his decision based upon matters within his competence, such as whether the building is structured to accommodate overnight patients, with the requisite kitchen facilities and sleeping quarters. This seems especially so given that, as Crudele testified, he normally makes his decision whether a facility is a permitted use primarily by examining the architectural plans and building specifications.

But this quibble over the language of a municipal ordinance is not, strictly speaking, the business of federal courts. In this

---

5. Defendants have wisely declined to dispute plaintiff's *jus tertii* standing to raise the privacy rights of third parties. *See Planned Parenthood of R.I. v. Bd. of Medical Rev.*, 598 F.Supp. 625, 629 (D.R.I.1984).

circuit at least, the doors to the federal courthouse for individuals complaining of abusive conduct by zoning officials do not swing open so freely. The first circuit court has repeatedly emphasized the local nature of such disputes and has cautioned federal courts against sitting "as a super zoning board or a zoning board of appeals." *Raskiewicz v. Town of New Boston,* 754 F.2d 38, 44 (1st Cir.), *cert. denied,* 474 U.S. 845, 106 S.Ct. 135, 88 L.Ed.2d 111 (1985). Recognizing that every appeal by a disappointed developer necessarily involves some claim that zoning officials exceeded, abused, or distorted its authority, the court has decided that "a meaningful separation between federal and state jurisdiction" in this area requires federal courts to remain aloof while the rough and tumble of municipal land use disputes are played out in the local courts. *Creative Environments, Inc. v. Estabrook,* 680 F.2d 822, 833 (1st Cir.), *cert. denied,* 459 U.S. 989, 103 S.Ct. 345, 74 L.Ed.2d 385 (1982).

This is not to say, however, that federal courts should relax their vigilance or ignore their historic role of ensuring that fundamental constitutional rights are not embarrassed in the fray of local disputes. While restraint is warranted when a litigant complains only that zoning officials have violated state or municipal law, *Chiplin Enterprises v. City of Lebanon,* 712 F.2d 1524, 1527 (1st Cir.1983), "different considerations ... [are] present where recognized fundamental constitutional rights are abridged by official action or state regulation." *Estabrook,* 680 F.2d at 832 n. 9; *see Simmons v. Dickhaut,* 804 F.2d 182, 185 (1st Cir.1986) ("It is decisive that the harm complained of is ... the ... denial [of] a substantive, constitutional right").

The critical inquiry, therefore,—indeed, the only relevant one—is not whether Crudele's interpretation of the ordinance runs afoul of municipal law, but whether that interpretation conflicts with any of the constitution's substantive guarantees. That is to say, this court must decide whether applying the definition of Hospital under the zoning ordinance to facilities that provide out-patient abortion services, thereby imposing the requirement of obtaining a special use permit before it can operate in a C–1 zone, impermissibly burdens the right to privacy that incorporates a woman's decision whether or not to obtain an abortion.

### A. *Ripeness*

Before turning to the substantive merits of the dispute, however, this court must determine whether plaintiff's claims are properly before it. The defendants charge, and it is not disputed, that plaintiffs have failed to seek a special use permit as authorized by the Cranston Code; this omission, they contend, forecloses review by this court because a final determination concerning the application of the ordinance to the plaintiff's property has not been rendered by the zoning board. They do not dispute established law that plaintiffs alleging a civil rights violation under 42 U.S.C. section 1983 need not avail themselves of state judicial and administrative remedies before seeking relief in federal court. *See Patsy v. Fla. Bd. of Regents,* 457 U.S. 496, 516, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982); *Kercado–Melendez v. Aponte–Roque,* 829 F.2d 255, 259 (1st Cir. 1987). Rather, defendants maintain that, notwithstanding its concession as to exhaustion, there is, nevertheless, a distinct and separate ripeness requirement and that because plaintiffs have failed to seek a special use permit, their claims are simply not ripe for adjudication. They rely principally on *Williamson Cty. Reg. Plan. Comm. v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985).

In *Williamson,* a land developer had obtained a municipal planning commission's approval of a plan for the development of a residential tract; the plan conformed with the appropriate county zoning ordinances as well as the commission's interpretive regulations. After several years and substantial development, the commission revised its regulations and, finding the plan wanting under the new regulations, revoked its approval. The developer appealed to the board of zoning appeals, which determined that the commission should apply the regulations that were in effect at the time of the initial approval. The commission, however, believing the board

lacked jurisdiction to review its decision, declined to follow the board's order.

The developer then filed suit in federal district court under 42 U.S.C. section 1983, alleging that the commission had taken its property without just compensation. While the trial and appellate courts concerned themselves with the merits, the Supreme Court addressed the issue of whether the developer's failure to seek a variance prevented judicial review for want of a final decision by the zoning commission. Recognizing that *Patsy* permits a section 1983 plaintiff to forego state administrative remedies, the Court stated that "[t]he question whether administrative remedies must be exhausted is conceptually distinct, however, from the question whether an administrative action must be final before it is judicially reviewable." *Williamson*, 473 U.S. at 192, 105 S.Ct. at 3119. According to the Court:

> While the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decision-maker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate.

*Id.* at 193, 105 S.Ct. at 3120. Continuing, the Court stated:

> [R]esort to the procedure for obtaining variances would result in a conclusive determination by the commission whether it would allow respondent to develop the subdivision in the manner respondent proposed. The commission's refusal to approve the preliminary plat does not determine that issue; it prevents respondents from developing its subdivision without obtaining the necessary variances, but leaves open the possibility that respondent may develop the subdivision according to its plat after obtaining the variances.

*Id.* at 194, 105 S.Ct. at 3120.

 This court believes that while *Williamson* applies to the plaintiff's fifth amendment claim that its property was taken without just compensation, it does not foreclose consideration of plaintiffs' substantive due process and equal protection claims. This conclusion seems compelled primarily by the unique character of a Fifth Amendment takings inquiry and its relationship to other substantive constitutional questions.

First, it is quite clear that the *Williamson* Court was addressing only the respondent's takings claim and was not considering the application of the ripeness doctrine to the respondent's substantive and procedural due process claims, which had petered out in the courts below. But most important for our purposes, the *Williamson* ripeness doctrine, as the Court itself acknowledged, "is compelled by the very nature of the inquiry required by the Just Compensation Clause."

A court considering a takings claim must consider "the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the governmental action." *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979). Until a property owner has obtained a final decision regarding application of the ordinance to its property, "it is impossible to tell whether the land retain[s] any reasonable beneficial use or whether [existing] expectation interests have been destroyed." *Williamson*, 473 U.S. at 191, 105 S.Ct. at 3119. In other words, in any takings inquiry, a court must determine how many, if any, of the plaintiff's bundle of rights in the property have been severed. No answer to this question is possible "until a court knows what use, if any, may be made of the affected property." *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 2561, 2567, 91 L.Ed.2d 285 (1986).

In this case, however, plaintiff's substantive due process challenge focuses exclusively on the decision by the building inspector that the proposed use required a special permit in the first place. They con-

tend that this decision erects artificial and gratuitous obstacles in the path of a woman's right to obtain an abortion, thereby impinging on privacy rights. It is this act of the inspector, this characterization of the Women's Center as a Hospital requiring special dispensation from the zoning board, that inflicts, as they see it, an actual, concrete injury ripe for adjudication. Accordingly, this court holds that the *Williamson* ripeness doctrine does not apply where, as here, the plaintiff alleges that the act of the official infringes some substantive, constitutional right other than one premised on the Takings Clause. Plaintiffs' claims, therefore, regarding an alleged violation of privacy and equal protection, are properly before this court.

### B. *Privacy*

#### 1. The Burdens

It can hardly be disputed that not every official action which in some manner implicates an individual's exercise of a fundamental right—no matter how indirectly—is constitutionally infirm. The web of official regulation, if not in fact seamless, invariably causes distant tremors when isolated strands are plucked. The question, therefore, is not merely whether the act of the inspector in this case *implicates* the right to privacy, but whether that act "imposes a non-de minimus burden on that right." *Planned Parenthood of Rhode Island v. Bd. of Medical Review,* 598 F.Supp. 625, 630 (D.R.I.1984). The critical inquiry, as this court has previously intimated, is whether the challenged act "places an obstacle, absolute or otherwise, in the path, of a woman's free exercise of her decision" whether or not to obtain an abortion. *Id.* at 630. That obstacle exists when the official action "ha[s] the potential to frustrate or delay a woman's abortion decision." *Id.* at 634.

■ The Women's Center is one of only three out-patient facilities in Rhode Island that offer abortion services. The other two, Planned Parenthood of Rhode Island and GYN Services, are located in Providence. All of the non-Catholic hospitals in the state perform abortions, but the cost is approximately four times that of abortions performed in out-patient clinics, and generally, the state's major insurance carriers will cover only abortions performed in out-patient clinics absent proof that hospitalization is required in the particular case.

By characterizing the Women's Center as a Hospital rather than a Health Care Facility, the inspector delays operation of the facility significantly. Rather than being permitted immediate occupancy, months could pass before the zoning board decided to issue the special permit necessary for the Women's Center to begin operations. Every day the Women's Medical Center is prevented from occupying its new facility increases the likelihood that abortion patients will have to seek alternative care either in hospital settings, at considerable expense, or by traveling to one of the two out-patient clinics in Providence, also not without additional expense. Moreover, and far more compelling, any delay in obtaining an abortion increases the risk of the procedure. These burdens alone constitute a significant obstacle in the path of women seeking an abortion. *See City of Akron v. Akron Center for Reprod. Health,* 462 U.S. 416, 434–36, 103 S.Ct. 2481, 2494–96, 76 L.Ed.2d 687 (1983).

This court is not convinced that the burden is diminished merely by the fact that the Women's Center could have located, as a Hospital, in several other zones. It simply does not do to say, as this argument suggests, that rights are not burdened if they may be exercised elsewhere. *See West Side Women's Services v. City of Cleveland,* 573 F.Supp. 504, 519 (N.D.Ohio 1983). Constitutional guarantees are not to be found on a map, isolated geographically, honored there, ignored here. The reach of the Constitution's protections, put simply, is not to be measured by busfare. "The question is not whether the activity may be engaged in elsewhere, but whether it was constitutional to restrict it in the manner chosen by the defendants." *Id.* at 518.

This court is similarly unmoved by defendant's argument that because the inspector's interpretation of the ordinance

applies to all surgery, it is not "abortion specific" and therefore does not burden the right to privacy at all. That right would be porous armor indeed if the government could, simply by affixing the conclusory label "major surgery" to the abortion procedure, apply requirements which, although undoubtedly necessary to other procedures, may be wholly inappropriate in the abortion context. As the Seventh Circuit recently stated in *Ragsdale v. Turnock,* 841 F.2d 1358, 1370 (7th Cir.1988). "It is as much a vice to treat abortion similarly to dissimilar procedures as it is to treat it differently from analogous procedures. In either case, imposition of burdensome requirements which are completely unnecessary to the performance of safe abortions is attempted."

Accordingly, this court finds that the inspector's act of classifying the Women's Center as a hospital imposes a non-de minimus burden on a woman's decision whether or not to obtain an abortion.

### 2. The City's Interest

Bearing in mind that the right to an abortion is a fundamental right, *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed. 2d 147 (1973), once it is established that the restriction places a non-de minimus burden on that right, this court must then determine whether the restriction is supported by a compelling governmental interest. *Ragsdale,* 841 F.2d at 1368; *Planned Parenthood,* 598 F.Supp. at 630.

The defendant's presented the testimony of Dr. John Stuart, a licensed, board certified Rhode Island physician who, although he has never performed an abortion, specializes in general surgery. Dr. Stuart is responsible for establishing "quality assurance" standards for the Surgery Department at Roger Williams Hospital. He testified that, in his medical opinion, abortion is "major surgery" which should only be performed in a hospital setting. Presumably, Dr. Stuart's testimony was intended to prove that Crudele's interpretation of the zoning code is justified by a concern for maternal health, an established compelling interest under the teachings of *Roe,* 410 U.S. at 164–65, 93 S.Ct. at 732–33. The

defendants submit that because abortions constitute "major surgery" they can not be performed in Health Care Facilities. Plaintiff's expert, Dr. John DiOrio, Jr., an Obstetrician Gynecologist who is board certified at, among other hospitals, Women and Infants, and who is the Medical Director of the Women's Center, offered contrary testimony. He testified that an abortion before the second month of the second trimester constitute "minor surgery" because of its technical simplicity, brief duration, and its effectuation "exclusively under local anesthesia." According to Dr. DiOrio, he saw no reason why such procedures could not be performed safely in properly licensed, out-patient facilities.

This court is decidedly unimpressed with the defendant's proffered justification. First, with all due respect to Dr. Stuart and Cranston's laudable concerns for maternal safety, the evidence presented in this case clearly reveals that the Director of Health for this state is apparently of the mind, as expressed in promulgated regulations, that up to the beginning of the fifteenth week abortions may be performed safely "outside the hospital or Freestanding Ambulatory Surgical Center, when hospital emergency back-up services are available." Dep't. of State regs section 600.2. The Women's Center has a transfer agreement with Women and Infants Hospital by which it can have its patients immediately admitted to the hospital in the event of an emergency. It also has a contract with an ambulance service to effect the immediate transfer of patients to the hospital. Second, defendants have overlooked Supreme Court authority and authority from this court rejecting similar claims. *See, e.g., City of Akron,* 462 U.S. at 438, 103 S.Ct. at 2497 (concluding that present medical knowledge demonstrates that up to the early weeks of the second trimester "abortions may be performed as safely in an outpatient clinic as in a full-service hospital"); *Women's Medical Ctr. of Prov., Inc. v. Cannon,* 463 F.Supp. 531, 537 (D.R.I.1978) (comparing first trimester abortions to tonsillectomies, removal of skin lesions, oral surgery, "and other minor surgeries"). Confronted with such compelling state and

federal authority to the contrary, I simply cannot accept defendants' argument that abortion is "major surgery" that can not be performed in suitable out-patient clinics.

Accordingly, this court holds that Crudele's interpretation of the Cranston zoning ordinance impermissibly intrudes upon the right to privacy.

### EQUAL PROTECTION

■ For essentially the same reasons it conflicts with substantive due process, Crudele's interpretation also violates equal protection of the laws. There is no question that abortion has been singled out for special treatment by the city of Cranston. This is evident by the fact that facilities which perform numerous other procedures, such as tonsillectomies, oral surgery, removal of skin lesions, repair of lacerations, removal of abscesses and other minor surgeries, which are all procedures of similar or greater medical risk than abortions, *see Cannon*, 463 F.Supp. at 537, are not subject to the same requirement as the Women's Center. The numerous emergency centers, out-patient clinics and physicians' offices which are located in the C–1 zone and perform such minor surgical procedures as delineated above are not considered by the city to require special use permits. Absent a compelling reason for treating abortion differently which, as this court has noted, defendants have failed to demonstrate, the special treatment conflicts with the guarantees of equal protection.

### PROCEDURAL DUE PROCESS

Plaintiffs also press a procedural due process challenge. They contend that Crudele's revocation of the building permit and issuance of the Cease and Desist Order without notice to PLS and in reliance upon essentially anonymous complaints from a few Cranston residents violated their right to some kind of pre-deprivation hearing.

The due process clause of the fourteenth amendment requires that states provide individuals with procedural protections when they are deprived of liberty or property. Whether a property right has been created is a question of state law. Under Rhode Island law, the issuance of a building permit confers vested rights which may not be revoked where substantial construction has been undertaken in reliance on the permit. *Tantimonaco v. Zoning Board of Review*, 102 R.I. 594, 232 A.2d 385, 386, 389 (R.I. 1967). Moreover, the first circuit has suggested that where the building permit has been in the possession of the developer for more than a brief period of time and the developer can show that he acted in reliance on it, some kind of pre-deprivation hearing is necessary before it may be revoked. *Cloutier v. Town of Epping*, 714 F.2d 1184, 1189–90 (1st Cir.1983); *see also Chongris v. Board of App. of Town of Andover*, 811 F.2d 36, 41 (1st Cir.1987).

■ Here, the permit had been issued on August 28 and revoked on September 28 of the same year. Immediately after it had been issued, PLS commenced construction and obtained a construction loan to finance the project. Under these facts, this court believes that PLS had a protectible property interest in the building permit.

■ While it is true that Crudele offered PLS an opportunity to contest his decision at a post-deprivation "informal hearing", this court does not believe that that was all PLS was constitutionally due. While *Cloutier* does indicate that a hearing after the revocation may in some circumstances satisfy due process requirements, that holding was predicated on the fact that there, the developer had obtained the permit only a few days before it was revoked and had not, in fact, acted in reliance on it. 714 F.2d at 1191. According to the court, "Given plaintiffs' limited interest and the risk they might act in reliance upon the permit and thus gain a greater interest in it as time went on, defendants were entitled to revoke without the delay of a pre-revocation hearing." *Id.* at 1192. In this case, a full month of construction had passed before Crudele had decided to revoke the permit. In light of this substantial reliance, this court believes that some kind of pre-revocation process was required.

I am not persuaded by the defendants' argument that the plaintiffs did not have a

valid property interest in the permit because it was issued under a mistake of fact concerning the intended use of the premises. While it is certainly true that if a license were issued under mistake of fact or in violation of law the licensee could claim no property right in the license, *Cloutier*, 714 F.2d at 1191, this court simply does not find the rule applicable to the present case. This exception applies only where the fact mistaken or the law allegedly violated could have provided valid grounds for the denial of the permit in the first place. Here, since denying the application solely on the basis that the Women's Center intended to perform abortions is, as this court has held, unconstitutional, it is an invalid criterion on which the application could have been denied. Therefore, since that fact could not have caused Crudele to validly deny the application, the subsequent discovery of that fact does not constitute valid grounds upon which Crudele could have revoked.

For the foregoing reasons, this court holds that plaintiffs were denied procedural due process by Crudele's revocation of the permit without prior notice and without providing an opportunity to be heard prior to the revocation.

CONCLUSION

For the foregoing reasons, I find that classifying the Women's Center as a Hospital under the Cranston Zoning Code, thereby requiring that facility to obtain a special permit before it is permitted to operate, violates the plaintiffs' substantive due process right in that it denies them equal protection and the right to privacy. I also find that Crudele's revocation of the building permit without a pre-revocation hearing violated procedural due process. Plaintiffs' takings claim, however, is not ripe for review under the teachings of *Williamson Cty. Reg. Plan. Comm. v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). Also, while plaintiffs have alleged several state infractions, I find resolution of those claims unnecessary in light of my holding under the federal constitution.

As to the issue of specific liability under 42 U.S.C. section 1983, however, I am somewhat less sure. While I hold that Inspector Crudele, who was acting under authority of state law, is liable for monetary damages caused by his actions, *see Malachowski v. City of Keene*, 787 F.2d 704, 710 (1st Cir.), *cert. denied*, 479 U.S. 828, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986), I would like both counsel's learned opinions as to whether the city of Cranston is liable under the teachings of *Monell v. Dept. of Soc. Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). For example, because the single act of a policy-making official may be said to represent an official policy for which the city may be held liable, *City of St. Louis v. Praprotnik*, — U.S. —, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988) (plurality); *Pembaur v. Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986); *see also Blackburn v. Snow*, 771 F.2d 556, 571 (1st Cir.1985), I would like memoranda from the parties concerning whether Crudele can be considered an official policy maker. Further, because I do not find any evidence of direct involvement by Mayor Traficante in the impermissible actions of Crudele, I would like the memoranda to discuss whether he may be liable as a supervisory official. *See, e.g., Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986). Also, the memoranda should discuss whether F. Charles Haigh, Crudele's subordinate, is liable under the teachings of *Miranda v. Munoz*, 770 F.2d 255, 259 n. 2 (1st Cir.1985) and *Clark v. Taylor*, 710 F.2d 4, 7 (1st Cir. 1983). Finally, the memoranda should address the possibility of conspiracy liability under 42 U.S.C. section 1985.

As to the defendants Al Bellows and George Gilbert, I find no evidence that they in any way participated in the unconstitutional actions of Crudele.

DAMAGES

Damages shall be calculated from February 1, 1988, the date the Women's Center would have been completed and ready for occupation.

1. Plaintiff's request damages at the rate of $4,094.00 for each month, beginning

in February, that they had to pay on the interest of their principal construction mortgage on the building and the interest on the note they secured to purchase the property. Because plaintiffs would have had to pay this amount anyway, I do not see it as damages caused by the defendants' actions. Accordingly, this request is denied.

2. For the same reason, plaintiff's request for damages in the amount of $5,724.00 per month for "operating costs" of the Women's Center at the new facility is also denied.

3. Plaintiff's request for $3,768.00 for rents they would have received from tenants occupying part of the Women's Center is also denied. Plaintiffs failed to provide any evidence that there were any prospective tenants waiting to occupy the facility.

4. Plaintiff's request for $23,700.00 for monies expended to maintain facilities at their old offices from February 1, 1988 to April 19, 1988, is granted.

5. Plaintiff's request for $11,031.18 for the cost of having to employ security guards to watch the premises from February 1, 1988 to the present is also granted. But for Crudele's actions, plaintiffs would have been able to occupy the building and the employment of such personnel would have been unnecessary.

6. Plaintiff's request for $1,515.20 that the PLS principals had to expend to travel to a loan closing in which, because of the issuance of the Cease and Desist Order, the lending institution was unwilling to participate, is also granted.

7. Finally, Plaintiff's request for $2,500.00 for the cost of employing the architectural firm of Robinson, Green & Beretta, which the lending institution required as a result of the delay, is also granted.

I do not find that this is an appropriate case for punitive damages. The defendants' acts were not, as I view the evidence, maliciously, wantonly, or oppressively done. *See Memphis Comm. School Dist. v. Stachura*, 477 U.S. 299, 306 n. 9, 106 S.Ct. 2537, 2542 n. 9, 91 L.Ed.2d 249 (1986).

Accordingly, plaintiffs are entitled to damages in the amount of $48,746.38. Plaintiffs are also entitled to costs and attorney's fees. Plaintiffs shall prepare an order that conforms to this opinion.